NATIONAL SAVINGS LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22379–80.    Filed March 28, 1985.

---

[11]See *supra* note 6.

*Carolyn P. Chiechi, Francis M. Gregory, Jr., Joseph F. McKeever III,* and *William B. Harman, Jr.,* for the petitioner. *James F. Kearney,* for the respondent.

TANNENWALD, *Judge*: Respondent determined the following deficiencies in petitioner's Federal income taxes:

| | |
|---|---|
| 1972 | $251,979 |
| 1973 | 127,952 |
| 1974 | 124,309 |

After agreements between and concessions by the parties, the issues for decision are:

(1) Whether petitioner is required to revalue life insurance reserves acquired in a statutory merger before adding such reserves to its own revalued opening balance of reserves for the year in which the merger took place, and, if so, whether petitioner is entitled to a deduction as an adjustment to reflect the revaluation;

(2) Whether petitioner may utilize the statutory formula appropriate for life insurance other than term insurance in revaluing the life insurance reserves it held with respect to certain contracts for which reserves were computed on a preliminary term basis; and

(3) Whether petitioner's renewable individual accident and health insurance policies that were in force for two years or less as of the end of each of its taxable years 1971, 1972, 1973,

and 1974 are "guaranteed renewable" accident and health insurance policies.[1]

## GENERAL FINDINGS OF FACT

The facts as to issues (1) and (3) above have been fully stipulated and are so found. Some of the facts as to the remaining issue have been stipulated and are so found. This reference incorporates the stipulations of facts and attached exhibits.

Petitioner, a Tennessee corporation authorized to do business in nine states as a stock life insurance company, had its principal office at the time it filed its petition in this case in Murfreesboro, Tennessee. Petitioner timely filed its Federal income tax returns for each of the years 1970 through 1974 with the Internal Revenue Service Center in Memphis, Tennessee.

During each of the years in issue, petitioner was a life insurance company, as defined in section 801(a),[2] subject to tax under the provisions of sections 801 through 820 (subchapter L, part I). In 1965, petitioner elected, pursuant to section 818(c), to revalue on the approximate method under section 818(c)(2) its life insurance reserves[3] that were computed on a preliminary term basis.[4] Petitioner was required to file, and did file, with the insurance department of each of the States in which it carried on an insurance business an annual statement prepared as prescribed by the National Association of Insurance Commissioners (NAIC) for insurance companies licensed to write life and accident and health insurance. The annual statement contains information as to petitioner's assets and

---

[1]A fourth open issue, dealing with the proper amount of net operating loss carryover from 1970 to the years in issue, will be decided based entirely upon our decision as to the above three issues and the parties' stipulation as to carryovers to 1970.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Rules of Practice and Procedure of this Court.

[3]Statutory life insurance reserves are required by State law to be held in an amount calculated in a specified manner that assures that such reserves, together with future net valuation premiums and future interest at the assumed rate, will be adequate to cover future death claims and other benefits under such policies. A statutory life insurance reserve with respect to an insurance contract may be defined, prospectively, as the difference, at any point in time, between the present value of future benefits provided under such contract and the present value of future net premiums for such contract. See *infra* note 7.

[4]For a description of the preliminary term method of reserve valuation, see *infra* pp. 516–517.

liabilities as of December 31 of each year and as to its income and expenses for each year.

## Issue 1

### FINDINGS OF FACT

As of August 19, 1970, Progressive Citizen Life Insurance Co. (Progressive), a stock life insurance company organized in 1964 under the laws of the State of Mississippi, was merged with and into petitioner in a statutory merger meeting the requirements of section 368(a)(1)(A) and to which section 381 was applicable. At the beginning of its taxable year 1970, and prior to its merger as of August 19, 1970, petitioner held life insurance reserves that were computed on a recognized pre-liminary term basis in the amount of $2,259,827 with respect to life insurance contracts that it had issued and that were in force at that time. As petitioner did not have any liabilities at the beginning of its taxable year 1970 and prior to the merger with respect to the life insurance contracts that Progressive had issued and had in force at the beginning of 1970, petitioner did not hold at the beginning of its taxable year 1970 any life insurance reserves with respect to such contracts of Progressive. As a result of the merger with Progressive, petitioner succeeded to all the rights and obligations of Progressive under each of the insurance contracts that Progressive had issued prior to such merger. Accordingly, after such merger, petitioner issued to each of Progressive's policyholders a "Certificate of Assumption," which informed each such policy-holder of petitioner's assumption of Progressive's obligations under such policies.

On August 19, 1970, the date of the merger, Progressive transferred to petitioner the dollar balance, viz $1,184,218, of Progressive's accounts on such date that represented life insurance reserves with respect to life insurance contracts the reserves for which were computed on a recognized preliminary term basis. Following the merger, a report setting forth, inter alia, the assets and liabilities of Progressive as of the date of such merger was filed with the Insurance Department of the State of Mississippi. Such report showed that as of August 19, 1970, immediately prior to the merger, Progressive held life insurance reserves including life insurance reserves computed

on a recognized preliminary term basis. All such life insurance reserves were transferred by Progressive to petitioner in such merger.

Throughout its existence, Progressive was a life insurance company, as defined in section 801(a), and as such was subject to tax under sections 801 through 820 (subchapter L, part I). As of its merger with petitioner, Progressive had made no election under section 818(c) to revalue its life insurance reserves that were computed on a preliminary term basis. On its tax returns for its taxable years ended on or before August 19, 1970, Progressive had taken a deduction under section 809(d)(2) in the total amount of $1,184,218 with respect to the life insurance reserves that were computed on a recognized preliminary term basis and the unrevalued dollar balance of which was transferred to petitioner on August 19, 1970.

On the date of the merger, Progressive and petitioner employed different methods of accounting, within the meaning of section 381(c)(4) and section 1.381(c)(4)–1, Income Tax Regs., with respect to their respective life insurance reserves that were computed on a recognized preliminary term basis. Progressive's method was to account for such reserves without revaluing them under section 818(c), while petitioner's method was to revalue such reserves under section 818(c)(2). Immediately after its merger with Progressive, petitioner held an amount of life insurance reserves computed on a recognized preliminary term basis, excluding the amount of life insurance reserves computed on a preliminary term basis that were transferred to it in the merger, that, when revalued pursuant to petitioner's section 818(c)(2) election, exceeded the amount of life insurance reserves that were held and transferred by Progressive to petitioner in the merger. At the end of its taxable year 1970, petitioner held life insurance reserves that were computed on a recognized preliminary term basis in the amount of $4,402,893 with respect to (1) life insurance contracts that it had issued and that were in force at the end of its taxable year 1970, and (2) life insurance contracts that Progressive had issued and that were if force at the end of petitioner's taxable year 1970 and for which petitioner had assumed liability as of August 19, 1970 as a result of the merger of Progressive into petitioner.

In determining its January 1, 1970 reserves for tax purposes, petitioner revalued under section 818(c)(2) its life insurance reserves that were computed on a recognized preliminary term basis and that it held at the beginning of its taxable year 1970 with respect to life insurance contracts that it had issued and that were in force as of the beginning of its taxable year 1970. Petitioner also took into account the unrevalued dollar balance, viz $1,184,218, of the life insurance reserves with respect to life insurance contracts for which such reserves were computed on a recognized preliminary term basis that were transferred to it by Progressive on the date of the merger. In determining its December 31, 1970 reserves for tax purposes, petitioner revalued under section 818(c)(2) its life insurance reserves that were computed on a recognized preliminary term basis and that it held at the end of its taxable year 1970 with respect to (1) life insurance contracts that it had issued and that were in force at the end of its taxable year 1970, and (2) life insurance contracts that Progressive had issued and that were in force at the end of petitioner's taxable year 1970 and for which petitioner had, as a result of the merger of Progressive into petitioner, assumed liability as of August 19, 1970.

Respondent determined that the dollar balance, viz $1,184,218, of the life insurance reserves with respect to life insurance contracts for which such reserves were computed on a recognized preliminary term basis that were transferred by Progressive to petitioner on August 19, 1970 was required to be revalued by petitioner, under section 818(c)(2), in determining petitioner's January 1, 1970 reserves for tax purposes.[5] Such revaluation resulted in increasing by $904,737 the amount (viz $1,184,218) of the life insurance reserves with respect to life insurance contracts for which such reserves were computed on a recognized preliminary term basis that were transferred by Progressive to petitioner on August 19, 1970. On its tax returns for its taxable years ended on or before August 19, 1970, Progressive had not taken a deduction for the amount of $904,737, which is the amount by which (a)

---

[5]Respondent's action was based upon a determination that revaluation was the principal method of accounting, which petitioner was required to adopt. See secs. 1.381(c)(4)–(c)(2) and 1.381(c)(4)–1(b)(3)(ii), Income Tax Regs. Solely for the purpose of the instant case, petitioner agrees with that determination. See also *infra* pp. 519–520.

the life insurance reserves that were computed on a recognized preliminary term basis and the dollar balance of which Progressive transferred to petitioner on August 19, 1970, as revalued by respondent under section 818(c)(2) (viz $2,088,955), exceeded (b) the dollar balance (viz $1,184,218) of the life insurance reserves computed on a recognized preliminary term basis which Progressive transferred to petitioner on the date of the merger. In determining peritioner's loss from operations, as defined in section 809(b)(2), for the year 1970, respondent did not make an adjustment pursuant to section 481 in conjunction with his determination that the reserves acquired from Progressive were required to be revalued. As a result, no deduction was allowed under section 809(d)(2) for the above amount of $904,737.

## OPINION

The issue for our decision is whether petitioner must, under section 381, add the reserves acquired from Progressive in the August 19, 1970 merger to its own January 1, 1970 reserve balance in the amount of the dollar balance of the acquired reserves ($1,184,218) or in the revalued amount under section 818(c) ($2,088,955). Disposition of this issue is of importance in calculating petitioner's deduction under sections 809(d) and 810(b) for its taxable year 1970, and thus its net operating loss carryovers to the years in issue.

As petitioner was, for the years in issue, a life insurance company within the meaning of section 801(a), the provisions of subchapter L, part I apply to the instant case. One of these provisions, section 809(d)(2), provides that for purposes of determining gain or loss from operations, a life insurance company shall be allowed a deduction for "The net increase in reserves which is required by section 810 to be taken into account for purposes of this paragraph." Section 810(b) explains that "If the sum of the items described in subsection (c) as of the close of the taxable year * * * exceeds the sum of such items as of the beginning of the taxable year, the excess shall be taken into account as a net increase referred to in section 809(d)(2)." The "items described in subsection (c)" include life insurance reserves. Sec. 810(c)(1). Thus, apart from the effect of other section 810(c) items, petitioner is entitled to a deduction for its taxable year 1970 in the amount by which

its reserves as of December 31, 1970 exceed its reserves as of January 1, 1970.

Section 818(c) provides an election whereby life insurance companies can revalue for tax purposes such of their reserves as are computed on a preliminary term basis.[6] State insurance authorities generally permit companies to compute their reserves for State law purposes using either the net level premium method or a preliminary term method. The net level premium method adds constant net premiums[7] to the reserve each year sufficient to maintain adequate statutory reserves. However, because a company incurs high first-year policy acquisition expenses, its gross premium[8] after expenses for first policy years is smaller than its net premium, resulting in a reduction of the company's surplus. To avoid this problem, the various preliminary term methods reduce the early-year net premiums to offset the amount of the acquisition expense, resulting in smaller additions to the reserves than under the net level premium method. For example, under the full preliminary term method, the first-year net premium for a given insurance policy becomes the net premium that would be required for a 1-year term insurance policy issued to the same policyholder. See generally D. Gregg & V. Lucas, Life and Health Insurance Handbook 165 (3d. ed. 1973); G. Lenrow, R. Milo & A Rua, Federal Income Taxation of Insurance Companies 368–369 (3d ed. 1979). Because use of the prelimi-

---

[6] For the years in issue, sec. 818(c) provides, in relevant part— '

For purposes of this part (other than section 801), at the election of the taxpayer the amount taken into account as life insurance reserves with respect to contracts for which such reserves are computed on a preliminary term basis may be determined on either of the following bases;

(1) EXACT REVALUATION.—As if the reserves for all such contracts had been computed on a net level premium basis (using the same mortality assumptions and interest rates for both the preliminary term basis and the net level premium basis).

(2) APPROXIMATE REVALUATION.—The amount computed without regard to this subsection—

(A) increased by $21 per $1,000 of insurance in force (other than term insurance) under such contracts, less 2.1 percent of reserves under such contracts, and

(B) increased by $5 per $1,000 of term insurance in force under such contracts which at the time of issuance cover a period of more than 15 years, less 0.5 percent of reserves under such contracts.

[7] Net premiums with respect to a life insurance contract (also known as net valuation premiums) are the amounts, determined on the basis of mortality tables and interest assumptions, that are used in the computation of statutory life insurance reserves, i.e., life insurance reserves required by State law. The net premium can be understood as the discounted value, given the mortality and interest assumptions, of the insurance company's obligation to cover the risks insured against. See generally S. Huebner & K. Black, Life Insurance 323–330 (10th ed. 1982).

[8] Gross premiums with respect to a life insurance contract are the premiums actually charged the policyholder for the contract, i.e., that which consumers ordinarily refer to as "premiums."

nary term methods results in smaller reserves than under the net level premium method, however, their use results in decreasing the tax deduction under sections 809(d)(2) and 810(b). The revaluation allowed under section 818(c) increases, for tax purposes, the company's reserves computed using a preliminary term method to a level equal to or approximating such reserves as computed under the net level premium method, thus allowing the electing company both the financial benefits of preliminary term reserve valuation and the tax benefits of net level premium reserve valuation. See H. Rept. 34, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 736, 748; S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 792.

A company electing under section 818(c) must revalue its reserve balances both at the beginning and end of the taxable year. Sec. 1.810–2(c)(3), Income Tax Regs. The question in the instant case is by what amount petitioner, a company using a preliminary term method and revaluing its reserves under section 818(c), is required to increase its reserves as of January 1, 1970 to take account of the reserves acquired on August 19, 1970 from Progressive, a company valuing its reserves using a preliminary term method and not revaluing them under section 818(c). As petitioner, in any event, will be required to add the revalued amount to its December 31, 1970 balances (see sec. 1.810–2(c)(3), Income Tax Regs.), the disposition of this issue will affect the amount of petitioner's deduction under sections 809(d)(2) and 810(b).

Section 381(a), providing generally for carryovers in corporate acquisitions, states in relevant part—

In the case of the acquisition of assets of a corporation by another corporation—

\*       \*       \*       \*       \*       \*       \*

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D), (F), or (G) of section 368(a)(1),

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, \* \* \*

Section 381(c)(22) provides specifically for acquisitions involving insurance companies—

If the acquiring corporation is an insurance company taxable under subchapter L, there shall be taken into account (*to the extent proper to carry out the purposes of this section and of subchapter L, and under such regulations as may be prescribed by the Secretary*) the items required to be taken into account for purposes of subchapter L in respect of the distributor or transferor corporation. [Emphasis added.]

The regulations under this provision refer to section 381(c)(4) for cases in which reserves are transferred in the acquisition—

the acquiring corporation shall take into account the reserves described in section 810(c) distributed or transferred to it as of the close of the date of distribution or transfer by the distributor or transferor corporation *in accordance with the provisions of section 381(c)(4) and the regulations thereunder.* [Sec. 1.381(c)(22)–(a), Income Tax Regs. Emphasis added.]

Section 381(c)(4), dealing with methods of accounting for corporate acquisitions, provides—

The acquiring corporation shall use the method of accounting used by the distributor or transferor corporation on the date of distribution or transfer unless different methods were used * * * by a distributor or transferor corporation and the acquiring corporation. If different methods were used, the acquiring corporation shall use the method or combination of methods of computing taxable income adopted pursuant to regulations prescribed by the Secretary.

This provision applies to the instant case, through section 381(c)(22), because petitioner and Progressive used different methods of accounting—petitioner had elected to revalue its life insurance reserves computed on a preliminary term basis using the approximate method under section 818(c)(2), while Progressive had made no such election. The regulations set forth a general rule for applying section 381(c)(4) that, at first blush, appears to be dispositive of the issue at bar—

The acquiring corporation shall take into its accounts the *dollar balances* of those accounts of the distributor or transferor corporation representing items of income or deduction which, because of its method of accounting, were not required or permitted to be included or deducted by the distributor or transferor corporation in computing taxable income for taxable years ending on or before the date of distribution or transfer. The acquiring corporation shall similarly take into its accounts the *dollar balances* of those accounts of the distributor or transferor corporation which represent *reserves in respect of which the distributor or transferor corporation has taken a deduction* for taxable years ending on or before the date of distribution or transfer. Items of income and deduction shall have the same

character in the hands of the acquiring corporation as they would have had in the hands of the distributor or transferor corporation or corporations if no distribution or transfer had occurred. [Sec. 1.381(c)(4)–1(a)(1)(ii), Income Tax Regs. Emphasis added.]

Thus, in order to carry out the essential purpose of section 381—i.e., enabling the acquiring corporation to step into the "tax shoes" of the acquired corporation[9]—the regulations, again at first blush, appear to require that petitioner treat the reserves acquired in the merger exactly as Progressive treated such reserves, namely, by adding the *dollar balances* of Progressive's reserves on the date of transfer ($1,184,218) to its opening balance. Accord sec. 1.381(c)(22)–1(a), *supra* (acquiring corporation must "take into account the reserves described in section 810(c) distributed or transferred to it"); see also Rev. Rul. 72–344, 1972–2 C.B. 218. Petitioner does not dispute this conclusion; it parts company with respondent only as to his contention that Progressive's reserves should be revalued as of August 19, 1970, and that the revalued dollar balance ($2,088,955) should be added to its January 1, 1970 reserve balance, resulting in a decrease of $904,737 in its deduction for 1970 under sections 809(d)(2) and 810(b).

The controversy centers around the regulations, promulgated under section 381(c)(4), *supra*, that set forth the method of accounting to be used when different methods were used by the acquiring and transferor corporations. Section 1.381(c)(4)–1(b)(3)(ii), Income Tax Regs., provides that if different methods of accounting are employed on the date of transfer with respect to trades or businesses that are integrated after the date of transfer, "the acquiring corporation shall adopt the principal method of accounting determined under paragraph (c) of this section, or the method of accounting determined in accordance with paragraph (d) of this section, whichever is applicable." The method under paragraph (c) is applicable in any case in which it may be used. Sec.

---

[9]The committee reports stated that:

"The new rules enable the successor corporation to step into the "tax shoes" of its predecessor corporation without necessarily conforming to artificial legal requirements which now exist under court-made law. Tax results of reorganizations are thereby made to depend less upon the form of the transaction than upon the economic integration of two or more separate businesses into a unified business enterprise."

H. Rept. 1337, 83d Cong., 2d Sess. 41 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 52 (1954).

1.381(c)(4)–1(d)(1)(i), Income Tax Regs. The parties agree that, under the rule in section 1.381(c)(4)–1(c)(2)(iv), Income Tax Regs., which requires a comparison of the aggregate amounts of the item in question held by the parties using different accounting methods, petitioner's revaluation method constitutes the principal method of accounting. It is regarding the operating rules for use of such method, and their application to section 818(c) situations, that the parties disagree.

Section 1.381(c)(4)–1(c)(1), Income Tax Regs., is the operating rule—

Whenever this paragraph applies, the increase or decrease in tax resulting from the change from the method of accounting previously used by any of the corporations involved shall be taken into account by the acquiring corporation. The adjustments necessary to reflect such change and such increase or decrease in tax shall be determined and computed in the same manner as if on the date of distribution or transfer each of the several corporations whose method or methods of accounting are required to be changed in accordance with this section had initiated a change in accounting method. In addition, the acquiring corporation shall take into account the portion of such adjustments which is attributable to pre-1954 Code years to the extent not taken into account by any of the other corporations in accordance with the rules provided in section 481(b)(4) and this paragraph. If a principal method of accounting is adopted under this paragraph, it will be unnecessary for the acquiring corporation to renew any election previously made by it or by any distributor or transferor corporation with respect to such principal method of accounting. Also, in such event, the acquiring corporation is bound by any election previously made by it or by any distributor or transferor corporation with respect to such principal method of accounting which is in effect on the date of distribution or transfer to the same extent as though the distribution or transfer had not occurred.

An apparent conflict between section 1.381(c)(4)–1(a)(1)(ii), *supra*, which requires petitioner to reflect the different methods of accounting by adding the dollar balance of the acquired reserves to its own reserves, and section 1.381(c)(4)–1(c)(1), *supra*, which, according to respondent, requires petitioner to reflect the adoption of the principal method of accounting by determining the tax consequences as if Progressive had itself made a section 818(c) election on August 19, 1970, lies at the heart of the dispute between the parties.

Respondent's position is neither clear nor consistent. At times, respondent seems to be arguing that, by virtue of section 1.381(c)(4)–1(c)(1), *supra*, the situation herein should be dealt with as though *Progressive* had made a section 818(c)

election, in which event the "dollar balances" petitioner must take into account under section 1.381(c)(4)–1(a)(1)(ii), *supra,* are the revalued dollar balances ($2,088,955). At other times, respondent seems to be arguing that, because of *petitioner's* election, petitioner was obligated, after taking into its accounts the unrevalued dollar balances of Progressive's reserves pursuant to section 1.381(c)(4)–1(a)(1)(ii), *supra,* to revalue those reserves as of August 19, 1970, pursuant to section 1.381(c)(4)–1(c)(1), *supra.* Under either approach, the revalued amount would, according to respondent, be added to petitioner's January 1, 1970 reserve balances for the purpose of determining petitioner's deduction under sections 809(d)(2) and 810(b). Petitioner, on the other hand, steadfastly maintains that nothing in the applicable statutes and regulations requires that what it describes as the "clear mandate" of section 381 and section 1.381(c)(4)–1(a)(1)(ii), *supra,* not be applied, with the result that only the dollar balance of Progressive's reserves, as computed by Progressive on a preliminary term basis, must be added to petitioner's January 1, 1970 reserves. For the reasons hereinafter stated, we agree with petitioner.

Although respondent does not specifically quote the "as if [the acquired corporation] had initiated a change in accounting method" language contained in section 1.381(c)(4)–1(c)(1), *supra,* such language seems to be the only part of the regulations that might support his position that petitioner must take into account the revalued dollar balances. This is so because if Progressive had made the section 818(c) election on August 19, 1970, it would have been required to revalue its reserves immediately before transferring them to petitioner. See sec. 1.810–2(c)(3), Income Tax Regs. In any event, we think that this language provides no foundation for this position. The language, it appears to us, is derived from and identified with the phrase "initiated by the taxpayer," found in section 481.[10] Such derivation and identification, along with the

---

[10]Sec. 481(a) provides—

In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted,

location of the "as if" phrase in the regulation—immediately before an explicit reference to pre-481 (i.e., pre-Code) years—leads us to conclude that that portion of section 1.381(c)(4)–1(c)(1), *supra*, comes into play only after it is determined that section 481 is applicable to a given situation.[11] Because the parties, though arguing strenuously as to the applicability of section 481, appear to agree that there is no section 481 issue should we find for petitioner on the issue of petitioner's opening balance, and because of our conclusion that only the dollar balances of Progressive's reserves, as computed by Progressive, must be added to petitioner's January 1, 1970 reserves, the language in section 1.381(c)(4)–1(c)(1), *supra*, is inapplicable to the instant situation. Having rejected respondent's argument that the "as if" language in the regulations requires that petitioner add the revalued amount to its January 1, 1970 reserves, we turn to respondent's contention that petitioner, after taking over the unrevalued dollar balances, was required to revalue the acquired reserves as of August 19, 1970 and add the revalued reserves to its January 1, 1970 balances.

Respondent bases this contention upon a number of provisions of the regulations. First, the last two sentences of section 1.381(c)(4)–1(c)(1), *supra*, provide that petitioner need not renew (and is in fact bound by) its section 818(c) election in order to adopt revaluation as the principal method of accounting. Second, section 1.810–2(c), Income Tax Regs., which sets forth special rules for determining whether there is a net increase or decrease in a company's section 810(c) items, contains a provision for reserves revalued under a section 818(c) election—

If a company which computes its life insurance reserves on a preliminary term basis elects to revalue such reserves on a net level premium basis under section 818(c), the sum of such reserves *at the beginning and end of all taxable years (including the first taxable year)* for which the election applies

---

except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

[11]See also sec. 1.381(c)(4)–1(a)(1)(ii), Income Tax Regs., which provides—

"The amount of the adjustments necessary to reflect a change in accounting method pursuant to this section, the manner in which they are to be taken into account, and the tax attributable thereto shall be determined and computed under section 481 and the regulations thereunder, *subject to the rules provided in paragraphs (c) and (d) of this section.* [Emphasis added.]"

shall be the sum of such reserves computed on such net level premium basis. [Sec. 1.810–2(c)(3), Income Tax Regs. Emphasis added.]

See also sec. 1.810–2(d), example (5), Income Tax Regs. Third, section 1.818–4(d), Income Tax Regs., requires that an electing company must, for the first taxable year of its election, "revalue all its life insurance reserves held with respect to contracts for which such reserves are computed on a preliminary term basis at the end of such taxable year," and, for all other taxable years, "must revalue all its life insurance reserves held with respect to contracts for which such reserves are computed on a preliminary term basis at the beginning or end of the taxable year." Respondent argues that the net effect of these provisions is to require petitioner to take over the acquired reserves and, as it would with any of its own reserves subject to its section 818(c) election, include the reserves in its January 1, 1970 balances in the revalued amount.

As we see it, there is a significant flaw in respondent's argument. The regulations in question provide generally that an electing company must revalue "*its* life insurance reserves" at both the beginning and end of the year. Sec. 1.810–2(c)(3), *supra* (emphasis added). There appears to be no provision regarding the opening balance for reserves acquired during the year; rather, the regulations provide that the January 1 balance of the company's section 810(c) items "shall be the aggregate of the sums of each of such items at the beginning of the taxable year." Sec. 1.810–2(c)(1), Income tax Regs. Revaluation is required as of the beginning of the year in order to prevent deductions based solely on the section 818(c) revaluation without an actual increase in reserves; revaluing as of January 1 any reserves not actually held by the company on that date is unnecessary to this end, and is thus not required under the regulations. See 1 T. Nash, Federal Taxation of Life Insurance Companies, sec. 12.03, at 12–12, 12–13 (1983); see also *United Life & Accident Insurance Co. v. United States*, 329 F. Supp. 765, 779–780 (D.N.H. 1971) (policies that lapse during the year must be revalued as of the beginning of the year, as they were in existence at that time); Rev. Rul. 70–568, 1970–2 C.B. 140 (to the same effect); cf. Rev. Rul. 75–163, 1975–1 C.B. 189 (company assuming reinsurance obligations during year should add zero to its opening balances). Thus, it is only those reserves actually held by petitioner at the beginning of the

year that must be revalued as of that date under the regulations.[12] In the instant case, petitioner acquired the reserves in question after January 1, 1970; thus, the regulations cited by respondent do not require that they be revalued as of that date.

Respondent also argues that the policy underlying section 381 would be violated if we were to hold that petitioner may add the unrevalued acquired reserves to its January 1, 1970 balance, as petitioner would thus enjoy a deduction to which no one would have been entitled had there been no merger, i.e., the $904,737 deduction. While respondent is correct regarding the fact that petitioner seeks a deduction that neither Progressive nor petitioner could have taken absent the merger, we do not find this fact dispositive.

As noted above, the policy behind section 381 is to allow the successor corporation to replace for tax purposes the acquired corporation, and to elevate the substance of the economic transaction over the particular form chosen by the parties. This policy is intended to be furthered by the regulations, which as discussed above, (1) require the acquiring corporation to "take into account the reserves described in section 810(c) distributed or transferred to it as of the close of the date of distribution or transfer by the distributor or transferor corporation" (sec. 1.381(c)(22)–1(a), *supra*), (2) require the acquiror to take into its accounts the "dollar balances" of the "reserves in respect of which the distributor or transferor corporation has taken a deduction" (sec. 1.381(c)(4)–1(a)(1)(ii), *supra*), and (3)

---

[12]We note that sec. 1.818–4(d), Income Tax Regs., relied upon by respondent, speaks only to the issue of which reserves are subject to the revaluation election. Sec. 1.818–4(d)(1), *supra*, provides that, for the taxable year of the election, only those reserves which are computed on a preliminary term basis at the end of the taxable year are subject to the election. Thus, any reserves that are "strengthened," i.e., recomputed for State law purposes on a net level premium basis, during such taxable year are not subject to the election. Sec. 1.818–4(d)(2), *supra*, then, simply states that, for later years, reserves are subject to the election so long as they are computed on a preliminary term basis at the beginning *or* end of the year, so that reserves that are strengthened during such later years are subject to the election. Contrary to respondent's assertion, these provisions do not state as of what time the revaluation is to take place. The phrase "at the beginning or end of the taxable year" modifies "computed," not "held." See *United Life & Accident Ins. Co. v. United States*, 329 F. Supp. 765, 779 (D.N.H. 1971).

In addition, while respondent correctly points out that when a company elects under sec. 818(c), there is no deduction in the year of election or any subsequent year for the amount by which the revalued opening reserve balance exceeds the unrevalued closing balance for the previous year (see sec. 1.810–3(f), example (*1*), Income Tax Regs.), this does not necessarily mean that when a company acquires reserves during the year, it must revalue such reserves as of Jan. 1 and thus be denied any deduction relating to such acquisition.

require that the items of deduction have "the same character in the hands of the acquiring corporation as they would have had in the hands of the distributor or transferor corporation or corporations if no distribution or transfer had occurred" (sec. 1.381(c)(4)–1(a)(1)(ii), *supra*).

In the instant case, Progressive ended its short taxable year 1970 on August 19, and took a deduction under section 809(d)(2) for the increase in its life insurance reserves and other section 810(c) items during the short year. The amount of reserves with respect to which Progressive took this deduction (and the deductions in each prior year in which Progressive added to its reserves to reach this amount) was computed on a preliminary term basis, and was not revalued under section 818(c), as Progressive had not made the election. The concern as to the instant case reflected in section 381 and its regulations is that petitioner, in stepping into Progressive's tax shoes, not be able to step back and pick up any tax benefits that Progressive already enjoyed, but step forward from Progressive's tax position as of August 19, 1970. Thus, on that date, petitioner must add the amount with respect to which Progressive already took its deductions—i.e., the unrevalued dollar balance ($1,184,218)—to its opening balances, and continue its year from there, albeit wearing new shoes.

It is true, as respondent urges, that when petitioner revalues its reserves at the end of 1970, including those acquired in the merger, and performs its section 810 calculation, it will compute an increase in the amount of $904,737 that Progressive could not possibly have sustained in 1970.[13] However, the result sought by respondent is also laden with conceptual problems. Pursuant to the merger, petitioner acquired new reserves in much the same manner as it would be collecting gross premiums under contracts issued during the taxable year. To require that petitioner add the revalued amount to its opening balances would be analogous in substance to requiring that petitioner revalue as of January 1 the reserves computed and held with respect to contracts *newly issued* on August 19, thus denying petitioner the deduction under sections 809(d)(2)

---

[13]Even if Progressive had elected under sec. 818(c) during 1970, assuming Progressive held *some* reserves on Jan. 1, 1970, the requirement under sec. 1.810–2(c)(3), Income Tax Regs., that an electing company revalue its reserves held at the beginning and at the end of the year assures that Progressive could not have computed this increase.

and 810(b) that was intended for companies incurring just such an increase in reserves.

The regulatory scheme under section 381, as we read it, is the shoehorn used to fit companies in petitioner's position as smoothly as possible into the acquired corporation's tax shoes and between two seemingly absurd results. By requiring that petitioner add the *unrevalued* dollar balance of Progressive's reserves to its January 1 balance,[14] the regulations deny to petitioner a deduction that would duplicate the total deductions with respect to such amount that Progressive took during its taxable years up to and including 1970. By not requiring that petitioner add the *revalued* amount to its January 1 balance, the regulations adjust for the fact that the shoes do not exactly fit (i.e., because petitioner had elected under section 818(c) and Progressive had not) by treating the situation as if *petitioner* had issued the acquired policies on their dates of actual issuance and under its section 818(c) election. Because Progressive had, as of August 19, 1970, already taken part of the deduction to which this scenario would entitle petitioner (i.e., that portion of the deduction for yearly increases in reserves resulting from Progressive's valuation of each year's new reserves on a preliminary term basis each December 31), the regulations allow petitioner only the remaining deduction under this scenario (i.e., the aggregate of the yearly deductions that petitioner would have taken had it issued Progressive's policies when they were actually issued and under its section 818(c) election, less the aggregate of the yearly deductions that Progressive actually took).

Respondent's view in the instant case incorrectly treats the situation as if petitioner held all the acquired policies on January 1, 1970 and made the election as to those policies on August 19, 1970, retaining its earlier election as to its other policies. Thus, respondent would require that petitioner revalue the acquired policies on August 19 and add the revalued amount to its opening balances, and would entirely deny the yearly deductions that petitioner would have received had it issued Progressive's policies when they were actually issued. Petitioner's view accomplishes the goal of accommodating the

---

[14]We note that the parties agree that the regulations require that petitioner must add at least this much to its opening balance. For a discussion of what we believe to be the actual requirement of the regulations under sec. 381, see *infra* pp. 527–528.

policy behind section 381 and the practical difficulties of the instant case, and we therefore hold for petitioner on the issue of the reflection of Progressive's reserves in petitioner's opening balance.[15]

We are constrained to point out that both parties appear to stray from the actual method by which the statutory and regulatory scheme produces the correct result in the instant case. Section 381 provides merely that the acquiring corporation "shall succeed to and take into account" the section 381(c) items; it is left to section 481 to work out the tax adjustments required due to any duplications or omissions resulting from such taking into account. See sec. 1.381(c)(4)–1(a)(1)(ii), *supra*; sec. 1.381(c)(4)–1(c)(3), example (*1*), Income Tax Regs. In the instant case, the parties are in agreement that (1) at the minimum, the unrevalued dollar balances of the acquired reserves must be added to petitioner's opening balances and (2) if we were to decide, as we do, that the revalued amounts need not be added to petitioner's opening balances, there is no issue under section 481. As we noted above, however, nothing in section 381 or its regulations actually requires that the merger in issue have *any* effect on petitioner's opening balances (and thus its section 810 calculation) for 1970, as the reserves therefrom were acquired during the taxable year. Given the respective roles of sections 381 and 481, the proper method by which to reach the correct result herein appears to be (1) to require petitioner under section 381 to take the acquired reserves (revalued or unrevalued) into its accounts on August 19, 1970; (2) to require no addition to petitioner's January 1, 1970 reserve balance with respect to the acquired reserves; (3) to allow petitioner a section 810 increase, relating to the acquired reserves, of $2,088,955 over its January 1, 1970 reserve balance; and (4) to adjust petitioner's section 810(d)(2) deduction down to $904,737 under section 481 due to the fact that Progressive had already taken $1,184,218 of the $2,088,955 deduction. As the parties framed the issues as they

---

[15]See G. Lenrow, R. Milo & A. Rua, Federal Income Taxation of Insurance Companies 111 (3d ed. 1979); 2 R. Antes, A. Simmons & R. McCormack, Federal Income Taxation of Life Insurance Companies, sec. 53.04, at 33–16 (1984). We note that our conclusion is at odds with respondent's ruling on similar facts in Rev. Rul. 80–116, 1980–1 C.B. 141, a ruling not relied on by respondent herein and, in any event, based on questionable reasoning. See 2 R. Antes, A. Simmons & R. McCormack, *supra* at 33–27 to 33–36.

did, however, we can do no more than to note the true relationship of sections 381 and 481.[16]

*Issue 2*

### FINDINGS OF FACT

During the years in issue, petitioner had in force life insurance contracts issued under policy plans P8, P9, O1, OO, and OL that provided death benefits varying with the duration of the contract. Each of the contracts issued under these policy plans is a single contract of life insurance for which a single gross premium is charged the policyholder, and is of a type that has been sold by the life insurance industry since at least the 1940's.

Petitioner acquired policy plans P8 and P9 as a result of the merger of Progressive with and into petitioner. Each of the life insurance contracts under policy plans P8 and P9 provides that the following total amount is payable upon the death of the insured: (1) A stated amount of death benefit (referred to in the contract and hereinafter as the Face Amount); (2) an additional amount of death benefit (the Additional Death Benefit), equal to the Face Amount if death occurs prior to the end of the 15th policy year; and (3) an additional amount of death benefit (the Return of Premium Death Benefit), equal to the contract's annual gross premium multiplied by the number of full years for which premiums have been paid prior to death, if death occurs prior to the earlier of the end of the 20th policy year or age 65. Level annual gross premiums are payable for the life of the insured by the policyholder of a contract issued under policy plan P8 or P9.

Each of the life insurance contracts petitioner issued under policy plan O1 provides that the following total amount is payable upon the death of the insured: (1) A stated amount of death benefit (referred to in the contract and hereinafter as

---

[16]But for the limitation contained in sec. 481(b), i.e., proration where the adjustment exceeds $3,000, the result produced by the application of the suggested methodology would produce the same result as we have in fact reached herein.

We express no opinion on the precise effect of the "as if" language found in sec. 1.381(c)(4)–1(c)(1), Income Tax Regs., discussed at pp. 520, 521–523, *supra*, on this suggested approach. In order to do so, we would have to know how much of Progressive's reserve represented policies written during 1970, a fact that appears nowhere in the record herein. Suffice it to say that a proper application of the "as if" provision—i.e., to calculate the sec. 481 adjustment, rather than to effect the taking into account of Progressive's reserves under sec. 381—would not necessarily require increasing petitioner's opening balance by the full $2,088,955.

the Sum Insured), and (2) an additional amount of death benefit (the Return of Premium Death Benefit), equal to the sum of all annual gross premiums paid prior to death, if death occurs during the first 20 policy years. Level annual gross premiums are payable, until the earlier of the insured's death or the passage of 20 policy years, by the policyholder of a contract issued under policy plan O1.

Each of the life insurance contracts petitioner issued under policy plan OO is labeled "Whole Life Insurance Policy with Varying Amount of Insurance," and provides that the following total amount is payable upon the death of the insured: (1) A stated amount of death benefit (referred to in the contract and hereinafter as the Basic Amount of Insurance) that varies with the insured's age at issue and the policy year in which death occurs, and (2) an additional amount of death benefit (referred to in the contract and hereinafter as the Insured Annual Income Death Benefit) equal to an amount that varies with the insured's age at issue and the policy year in which death occurs, which is payable in the event of death before age 65. The following is an excerpt from the Table of Amount of Insurance set forth in the contracts, which indicates the total benefit payable at death occurring during various policy years:

| | | Figures applicable if beneficiary elects commuted value of insured annual income at insured's death | |
| Attained age | Basic amount of insurance | Commuted value of insured annual income | Total amount payable |
|---|---|---|---|
| 0 | $2,500 | $19,659 | $22,159 |
| 1 | 2,500 | 19,535 | 22,035 |
| 5 | 2,500 | 19,009 | 21,509 |
| 10 | 2,500 | 18,274 | 20,774 |
| 15 | 2,500 | 17,443 | 19,943 |
| 20 | 8,125 | 16,503 | 24,628 |
| 25 | 13,750 | 15,438 | 29,188 |
| 30 | 19,375 | 14,235 | 33,610 |
| 35 | 25,000 | 12,873 | 37,873 |
| 40 | 25,000 | 11,331 | 36,331 |
| 45 | 25,000 | 9,588 | 34,588 |
| 50 | 25,000 | 7,615 | 32,615 |
| 55 | 17,500 | 5,383 | 22,883 |
| 60 | 10,000 | 2,857 | 12,857 |
| 65 and life | 2,500 | 0 | 2,500 |

Level annual gross premiums are payable by a policyholder of a contract issued under policy plan OO until the earlier of the insured's attaining age 65 or the insured's death.

Each of the life insurance contracts petitioner issued under policy plan OL is labeled "Modified Premium Whole Life Policy with Reducing Term," and provides that the total amount payable upon the death of the insured (referred to in the contract and hereinafter as the Amount of Insurance) is to be determined from a Table of Amounts of Insurance per $1,000 of Ultimate Amount, which is incorporated as part of the contract and which set forth the amount of death benefit payable depending on the insured's age at issue and on the policy year in which death occurs. The following is an excerpt from such table:

| Policy year of death | Age at issue 45 and under | 50 | 55 | 60 |
|---|---|---|---|---|
| 1 | $2,000 | $2,000 | $2,000 | $2,000 |
| 2 | 1,950 | 1,934 | 1,900 | 1,800 |
| 3 | 1,900 | 1,867 | 1,800 | 1,600 |
| 4 | 1,850 | 1,800 | 1,700 | 1,400 |
| 5 | 1,800 | 1,734 | 1,600 | 1,200 |
| 6 | 1,750 | 1,667 | 1,500 | 1,000 |
| 7 | 1,700 | 1,600 | 1,400 | 1,000 |
| 8 | 1,650 | 1,534 | 1,300 | 1,000 |
| 9 | 1,600 | 1,467 | 1,200 | 1,000 |
| 10 | 1,550 | 1,400 | 1,100 | 1,000 |
| 11 | 1,500 | 1,334 | 1,000 | 1,000 |
| 12 | 1,450 | 1,267 | 1,000 | 1,000 |
| 13 | 1,400 | 1,200 | 1,000 | 1,000 |
| 14 | 1,350 | 1,134 | 1,000 | 1,000 |
| 15 | 1,300 | 1,067 | 1,000 | 1,000 |
| 16 | 1,250 | 1,000 | 1,000 | 1,000 |
| 17 | 1,200 | 1,000 | 1,000 | 1,000 |
| 18 | 1,150 | 1,000 | 1,000 | 1,000 |
| 19 | 1,100 | 1,000 | 1,000 | 1,000 |
| 20 | 1,050 | 1,000 | 1,000 | 1,000 |
| 21 and up | 1,000 | 1,000 | 1,000 | 1,000 |

Except for the first year gross premium, level annual gross premiums are payable for the life of the insured by a policyholder of a contract issued under policy plan OL. Petitioner first issued contracts under policy plan OL in 1973.

Petitioner, in calculating for the contracts issued under these policy plans the gross premium, the net premium, the reserve, and the cash value,[17] treated each such contract as a single, unitary contract of life insurance. The death benefit that was payable at any point in time under each contract issued under policy plan P8, P9, O1, OO, or OL was contractually fixed from the issue date of each contract and could not be altered thereafter by either the policyholder or petitioner. If an applicant for insurance desired to purchase from petitioner only some portion of the death benefit payable under a contract issued under such policy plans, and did not desire to purchase the entire death benefit payable under such a contract, such person could not purchase separately, and petitioner did not sell separately, such a portion of the entire death benefit payable under such a contract. Neither petitioner nor the policyholder of a contract issued under policy plan P8, P9, O1, OO, or OL could cancel or otherwise terminate some portion of the death benefit under such contract while keeping other portions of the death benefit under such contract in force. In those cases in which petitioner required an applicant for a contract issued under such policy plans to have a medical examination prior to issuance of such contract, a medical examination was required only prior to the issuance of such contract and no additional medical examination was required prior to any increases in the death benefit that might be scheduled to take place pursuant to the terms of such contract.

Each of the life insurance contracts issued under policy plans P8, P9, O1, OO, and OL requires the periodic payment of a gross premium. Such gross premium was not segregated by petitioner into parts, nor was any portion of such premium identified by petitioner in such contracts, or elsewhere, with some portion of the death benefit under such contracts. Rather, such gross premium was calculated by petitioner and payable by the policyholder for the entire death benefit under each such contract. Each periodic gross premium paid by a

---

[17]The cash value of a life insurance contract is the amount that a life insurance company is contractually obligated to pay the policyholder of the contract in the event that such policyholder surrenders the contract to the insurance company. The minimum amount of cash value that a life insurance company must provide under a life insurance contract is prescribed by the State nonforfeiture law.

policyholder with respect to a contract issued under policy plan P8, P9, O1, OO, or OL was paid with respect to the death benefit under the contract, including the past and future death benefit, and was not paid only with respect to the amount of such death benefit that was in force at the time of the premium payment. The gross premium payable with respect to each of the contracts issued under such policy plans was level throughout the entire premium-paying period, except that the gross premium for the first policy year under a contract issued under policy plan OL was larger than the gross premium in subsequent years.

The net premium with respect to each of the contracts issued under policy plans P8, P9, O1, OO, and OL was a net premium calculated and established by petitioner for the death benefit under each contract. Such net premium was not segregated by petitioner into parts, nor was any portion of such net premium identified by petitioner in such contracts, or elsewhere, with some portion of the death benefit under such contracts. Petitioner took into account in computing the net premium the entire death benefit for all policy years under each such contract.

Petitioner calculated and held a statutory life insurance reserve in respect of the death benefit under each of the contracts issued under policy plans P8, P9, O1, OO, and OL. It did not calculate and hold one statutory reserve with respect to some portion of the death benefit under the contracts issued under such policy plans and a separate statutory reserve with respect to some other portion of the death benefit under such contracts. The statutory life insurance reserve petitioner calculated and held in respect of each of the contracts issued under policy plans P8, P9, O1, OO, and OL was calculated and held in respect of the death benefit payable under each such contract at all durations. Thus, for example, in the first policy year, the statutory reserve calculated and held by petitioner with respect to a contract issued under policy plan P8 was the excess of the present value of the future death benefit under such contract over the present value of the future net premiums under such contract. Petitioner reported in its annual statements the aggregate of the statutory life insurance reserve in respect of the death benefit under each of the contracts issued under policy plans P8, P9, O1, OO, and OL.

Petitioner did not report in its annual statements an aggregate statutory reserve with respect to some portion of the death benefit under the contracts issued under such policy plans and a separate aggregate statutory reserve with respect to some other portion of the death benefit under such contracts. The aggregate of the statutory life insurance reserve in respect of the death benefit under each of the contracts issued under policy plans P8, P9, O1, OO, and OL that petitioner reported in its annual statements was reported with respect to the death benefit payable under such contracts at all durations. The statutory life insurance reserves petitioner calculated and held with respect to contracts issued under policy plans P8, P9, O1, OO, and OL were calculated on the basis of (1) the 1958 Commissioners Standard Ordinary Mortality Table, (2) an assumed rate of interest of 3 percent, and (3) the Commissioners Reserve Valuation Method, which is a recognized preliminary term method within the meaning of section 1.818–4(a), Income Tax Regs. Such statutory life insurance reserves were life insurance reserves within the meaning of section 801(b).

Petitioner calculated a cash value in respect of the death benefit under each of the contracts issued under each of the policy plans P8, P9, O1, OO, and OL. It did not calculate one cash value with respect to some portion of the death benefit under the contracts issued under such policy plans and a separate cash value with respect to some other portion of the death benefit under such contracts.

Some life insurance companies issue to the same person (1) contracts of permanent insurance[18] to which are attached one or more riders[19] that provide term insurance,[20] and/or (2) contracts of permanent insurance and separate contracts of term insurance. In issuing the contracts under policy plans P8, P9, O1, OO, and OL, petitioner did not issue to the same person

[18]Permanent insurance is any form of life insurance other than term insurance.

[19]A rider is a separate contractual provision that is attached to a life insurance contract and that usually expands the benefits provided under such life insurance contract. If a rider expands the benefits under the life insurance contract to which it is attached by providing, for example, term insurance, a separate gross premium is charged the policyholder for the term insurance rider, in addition to the separate gross premium charged the policyholder for the contract of life insurance to which such rider is attached.

[20]Term insurance is, in a general sense, life insurance provided for a limited period of time, the face amount of the policy being payable only if death occurs during the limited period of time. The specific definition of term insurance under sec. 818(c) will be discussed in more detail below.

(1) contracts of permanent insurance to which are attached one or more riders that provide term insurance, or (2) contracts of permanent insurance and separate contracts of term insurance. Moreover, during the years in issue, petitioner did not provide the same benefits provided by any of such policy plans under either a permanent contract with one or more term insurance riders or a contract of permanent insurance and a separate contract of term insurance.

The death benefits under a contract of permanent insurance to which is attached a term insurance rider are separable. Thus, the policyholder of a contract of permanent insurance to which is attached a term insurance rider can stop paying the separate, additional gross premium for the term insurance rider and allow such term insurance rider to lapse, while continuing to pay the separate gross premium for the contract of permanent insurance and keeping such contract of permanent insurance in force. However, a term insurance rider will not continue in force if the contract of permanent insurance to which such rider is attached is terminated. The respective death benefits under separate contracts of permanent insurance and term insurance issued to the same person are likewise separable. Thus, the policyholder of both a contract of permanent insurance and a contract of term insurance can stop paying the separate gross premium for either contract and allow such contract to lapse, while continuing to pay the separate gross premium for the other contract and keeping such other contract in force. In addition, a person can purchase a contract of permanent insurance from a life insurance company without purchasing a contract of term insurance; such person can also purchase a contract of term insurance without purchasing a contract of permanent insurance.

A life insurance company that issues a contract of permanent insurance to which is attached a term insurance rider calculates one gross premium, one net premium, one statutory reserve, and one cash value with respect to the contract of permanent insurance and a separate, additional gross premium, a separate net premium, a separate statutory reserve, and a separate cash value (if there is a cash value) with respect to the term insurance rider. A life insurance company that issues to the same person both a contract of permanent insurance

and a contract of term insurance similarly calculates one gross premium, one net premium, one statutory reserve, and one cash value with respect to the contract of permanent insurance and a separate, additional gross premium, a separate net premium, a separate statutory reserve, and a separate cash value (if there is a cash value) with respect to the contract of term insurance. Because of the additional administrative expenses typically associated with issuing either a contract of permanent insurance to which is attached a term insurance rider or a contract of permanent insurance together with a separate contract of term insurance, a company will typically charge aggregate gross premiums for the contract with a rider or for the separate contracts that exceed the gross premium charged for a single contract providing an identical amount of death benefit.

The NAIC has promulgated a model law, the Standard Valuation Law, that sets forth minimum standards for the calculation, or "valuation," of life insurance reserves. The NAIC has also promulgated a model law, the Standard Nonforfeiture Law, that sets forth minimum nonforfeiture benefits under life insurance contracts. Because petitioner was domiciled in the State of Tennessee, it was subject to the requirements of the Standard Valuation Law as in effect in the State of Tennessee during the years in issue (the Tennessee Standard Valuation Law) and the Standard Nonforfeiture Law as in effect in the State of Tennessee during the years in issue (the Tennessee Standard Nonforfeiture Law), both of which were interpreted and administered by the Tennessee Department of Insurance. Petitioner was also subject to the requirements of all the States in which it was authorized to do business. It is a principal concern of the Tennessee Department of Insurance that statutory reserves be sufficient to cover future benefits provided under insurance contracts and that an insurance company be solvent.

In each of the years in issue, the Tennessee Standard Valuation Law, as interpreted and administered by the Tennessee Department of Insurance, required an insurance company issuing a life insurance contract providing an amount of death benefit that varies with the duration of the contract to calculate and hold, as a minimum amount of statutory reserves, a statutory life insurance reserve in an amount

calculated on a preliminary term basis in respect of the death benefit provided under the contract. In each of the years in issue, petitioner valued and reported in exhibit 8 of its annual statements, in accordance with the requirements of the Tennessee Standard Valuation Law applicable to a contract providing an amount of death benefit that varies with the duration of the contract, the statutory reserves with respect to contracts issued under each of the policy plans P8, P9, O1, OO, and OL. For each of the years in issue, a valuation certificate was issued annually to petitioner by the Tennessee Department of Insurance that certified therein that petitioner was authorized to do business in Tennessee. The Department further certified that petitioner had valued its statutory reserves in accordance with the requirements of Tennessee law, and it set forth the dollar amount of such reserves and the description of the bases on which they were computed by reference to exhibit 8 of the annual statement. Petitioner's statutory reserves with respect to contracts issued under policy plans P8, P9, O1, OO, and OL, valued on the preliminary term basis, were included in the statutory reserves certified in the department's valuation certificates for each of the years in issue. For each of the years in issue, the statutory reserves with respect to contracts issued under policy plans P8, P9, O1, OO, and OL that petitioner valued and reported in its annual statements were accepted by the Tennessee Department of Insurance as held for the fulfillment of the future unaccrued claims of policyholders or beneficiaries of contracts issued by petitioner under such policy plans. Once petitioner's statutory reserves with respect to contracts issued under policy plans P8, P9, O1, OO, and OL were established on the basis prescribed by Tennessee law and reported in its annual statements to the Tennessee Department of Insurance, petitioner was required by Tennessee statutory provisions and by the rules and regulations of the department to maintain such reserves on such basis and not to reduce or "weaken" such reserves by changing such basis without the approval of the department.

During the years in issue, the Tennessee Standard Nonforfeiture Law required nonforfeiture benefits to be provided in the form of cash surrender values, extended term insurance, and reduced paid-up insurance. During the years in issue, the

Tennessee Standard Nonforfeiture Law provided for the calcu-
lation of cash values on one basis for any policy providing term
insurance benefits by rider or supplementary policy provision
and on another basis for any policy providing an amount of
death benefit that varies with the duration of the policy.
During the years in issue, petitioner calculated the cash value
of each contract issued under each of the policy plans P8, P9,
O1, OO, and OL under the provision of the Tennessee Stan-
dard Nonforfeiture Law applicable to policies providing an
amount of death benefit that varies with the duration of the
policy, and not under the provision of that law applicable to
policies providing term insurance benefits by rider or supple-
mental policy provision.

On its annual statements for the years in issue, petitioner
reported certain of the death benefits payable with respect to
policy plans P8, P9, O1, OO, and OL on the lines provided for
reporting amounts of term insurance, as follows:

| Annual statement | Policy plan | Death benefit | How reported |
| --- | --- | --- | --- |
| 1970 | O1 | Return of premium | "Other term insurance" |
| 1971 | P8, P9 | Additional death benefit | "Term policies—other" |
| | | Return of premium | "Other term insurance" |
| | O1 | Return of premium | "Other term insurance" |
| 1972 | P8, P9 | Additional death benefit | "Other term insurance— decreasing" |
| | OO | Insured annual income | "Other term insurance— decreasing" |
| 1973 | O1 | Return of premium | "Other term insurance" |
| | P8, P9 | Additional death benefit | "Other term insurance" |
| 1974 | P8, P9 | Additional death benefit | "Other term insurance" |

Based on the documents that petitioner has in its possession, it
cannot be determined whether petitioner reported any of the
death benefit payable with respect to any of the contracts
issued under policy plan P8, P9, O1, or OO as "other term
insurance" on its annual statement for 1972, or as "other term
insurance—decreasing" on its annual statements for 1973 and
1974. Petitioner did not report as term insurance any of the

death benefit payable under policy plan OL on its 1972, 1973, and 1974 annual statements.

In various documents, employees of petitioner calculated the reserves with respect to the death benefits under the contracts issued under policy plans P8, P9, O1, OO, and OL. For the most part, these documents do not reflect calculations for each of the separate components of the death benefit payable under contracts issued under the policy plans at issue. However, a worksheet prepared by an unidentified employee of petitioner does contain entries representing the aggregate of the Additional Death Benefit with respect to all contracts issued and in force under policy plans P8 and P9 as of December 31, 1973 and December 31, 1974, the aggregate of the Return of Premium Death Benefit with respect to all such contracts under policy plan O1 as of such dates, and the aggregate of the initial Basic Amount of Insurance with respect to all such contracts under policy plan OO as of such dates. Additionally, a worksheet prepared by an unidentified employee of petitioner in connection with the development of certain financial statements by petitioner's independent accountants contains entries representing the aggregate of the initial Insured Annual Income Death Benefit with respect to all contracts issued and in force under policy plan OO as of December 31, 1974 and June 30, 1975, the aggregate of the initial Basic Amount of Insurance for such contracts under policy plan OO as of such dates, the aggregate of the Additional Death Benefit for such contracts under policy plans P8 and P9 as of such dates, and the aggregate of the Face Amount for such contracts under policy plans P8 and P9 as of such dates. Similarly, a document entitled "Reserve Valuation Summary by Plan," prepared by petitioner in the first two months of 1974, contains entries representing the aggregate of the Additional Death Benefit with respect to all contracts issued and in force under policy plans P8 and P9 as of December 31, 1973, the aggregate of the Face Amount with respect to such contracts under policy plans P8 and P9 as of such date, the aggregate of the initial Insured Annual Income Death Benefit with respect to such contracts under policy plan OO as of such date, and the aggregate of the initial Basic Amount of Insurance with respect to such contracts under policy plan OO as of such date.

On its tax return for each of the years 1971 and 1973, petitioner failed to take account of the Return of Premium Death Benefit under contracts issued under policy plans P8 and P9 in revaluing under section 818(c) its reserves in respect of contracts issued under each such plan. On its tax return for each of the years 1970 through 1974, except as just indicated, petitioner made a revaluation in respect of the Additional Death Benefit and the Return of Premium Death Benefit provided under contracts issued under policy plans P8 and P9 under section 818(c)(2)(B) on the basis of $5 per $1,000 of such death benefits in force. Petitioner did not allocate any portion of the statutory reserves it held in respect of contracts issued under policy plans P8 and P9 to the Additional Death Benefit or to the Return of Premium Death Benefit, and did not reduce by 0.5 percent of reserves in respect of such part of the death benefit the amount of approximate revaluation it had calculated under section 818(c)(2)(B) with respect to such part. Except as described above, on its tax return for each of the years 1970 through 1974, petitioner revalued the reserves for contracts issued under policy plans P8 and P9 under section 818(c)(2)(A) on the basis of $21 per $1,000 of insurance in force, less 2.1 percent of the reserves under such contracts.

On its tax return for each of the years 1970 through 1974, petitioner made a revaluation in respect of the Return of Premium Death Benefit provided under contracts issued under policy plan O1 under section 818(c)(2)(B) on the basis of $5 per $1,000 of such death benefit in force. Petitioner did not allocate any portion of the statutory reserves it held in respect of contracts issued under policy plan O1 to the Return of Premium Death Benefit, and did not reduce by 0.5 percent of reserves in respect of such part of the death benefit the amount of approximate revaluation it had calculated under section 818(c)(2)(B) with respect to such part. Except as described above, on its tax return for each of the years 1970 through 1974, petitioner revalued the reserves for contracts issued under policy plan O1 under section 818(c)(2)(A) on the basis of $21 per $1,000 of insurance in force, less 2.1 percent of the reserves under such contracts.

On its tax return for each of the years 1970 through 1974, petitioner failed to include reserves attributable to several contracts issued under policy plan OO in making the revalua-

tion under section 818(c) of its reserves in respect of contracts issued under such plan. Except as indicated above, on its tax return for such years, petitioner made a revaluation in respect of a part of the death benefit under contracts issued under policy plan OO under section 818(c)(2)(B) on the basis of $5 per $1,000 of insurance in force with respect to such portion. Petitioner did not allocate any portion of the statutory reserves it held in respect of contracts issued under its policy plan OO to such part of the death benefit, and did not reduce by 0.5 percent of reserves in respect of such part of such death benefit the amount it calculated under section 818(c)(2)(B) with respect to such part. Otherwise, on its tax return for such year, petitioner revalued the reserves for contracts issued under policy plan OO under section 818(c)(2)(A) on the basis of $21 per $1,000 of insurance in force, less 2.1 percent of the reserves under such contracts.

On its tax return for each of the years 1973 and 1974, petitioner revalued its reserves for contracts issued under policy plan OL under section 818(c)(2)(A) on the basis of $21 per $1,000 of insurance in force, less 2.1 percent of the reserves under such contracts. Petitioner also made a section 818(c)(2)(B) revaluation on its tax return for such years in respect of a return of premium death benefit under contracts issued under policy plan OL. Such contracts did not in fact provide for a return of premium death benefit.

Respondent determined as follows as regards contracts issued under the policy plans in issue:

| Policy plan | Portion of death benefit | Respondent's characterization |
|---|---|---|
| P8 and P9 | Face amount | Other than term insurance |
| | Return of premium (under contracts issued to individuals whose age was less than 50 years) | Term insurance of more than 15 years |
| | Additional death benefit | Term insurance of 15 years or less |
| O1 | Sum insured | Other than term insurance |

| Policy plan | Portion of death benefit | Respondent's characterization |
|---|---|---|
| | Return of premium | Term insurance of more than 15 years |
| OO | Basic amount of insurance | Part other than term insurance, part term insurance of more than 15 years |
| | Insured annual income | Term insurance of more than 15 years |
| OL | Amount of insurance | Part other than term insurance part, term insurance of more than 15 years |

Respondent did not allocate any portion of the statutory reserves held by petitioner in respect of (1) contracts issued under policy plans P8 and P9 to the Return of Premium Death Benefit or to the Additional Death Benefit under such contracts, (2) contracts issued under policy plan O1 to the Return of Premium Death Benefit under such contracts, (3) contracts issued under policy plan OO to the Insured Annual Income Death Benefit or to the portion of the Basic Amount of Insurance under such contracts that respondent treated as term insurance of more than 15 years, and (4) contracts issued under policy plan OL to the portion of the Amount of Insurance under such contracts that respondent treated as term insurance of more than 15 years.

## OPINION

The issue for decision is by what amount the reserves in respect of petitioner's contracts issued under Plans P8, P9, O1, OO, and OL should be revalued. During the years at issue, a life insurance company that elected, under section 818(c), to revalue on the net level premium method its reserves computed on a preliminary term basis (see *supra* pp. 516–517 could do so either by means of an exact revaluation under section 818(c)(1) or an approximate revaluation under section 818(c)(2) on the following basis:

(2) APPROXIMATE REVALUATION.—The amount computed [on a prelimi-
nary term basis]—

    (A) increased by $21 per $1,000 of insurance in force (other than term
insurance) under such contracts, less 2.1 percent of reserves under such
contracts, and

    (B) increased by $5 per $1,000 of term insurance in force under such
contracts which at the time of issuance cover a period of more than 15
years, less 0.5 percent of reserves under such contracts.

Resolution of the dispute between the parties turns upon a
determination of whether the insurance under the contracts in
issue falls wholly within (A) or (B), partly within each, or
within neither. Respondent contends that, in order to make
such a determination, insurance coverage under the contracts
should be segregated into its term and permanent[21] compo-
nents. Petitioner counters with the assertion that such segre-
gation is not proper and that, since each of the contracts was
issued as a single, unitary insurance policy and contained an
element of coverage which is properly characterized as "other
than term," i.e., permanent, insurance, only the adjustments
provided for in section 818(c)(2)(A) are applicable.

The issue of unitary view versus segregated view affects four
elements involved in the application of section 818(c)(2)(A) and
(B):

(1) whether the insurance should be categorized as term
insurance having a term of 15 years or less, in which event
neither (A) nor (B) applies;

(2) which flat dollar per thousand increase ($21 or $5) should
be used with respect to insurance to which (A) or (B) applies;

(3) the calculation of the amount of insurance to which the
$21 or $5 increase applies; and

(4) the calculation of the amount of reserves to which the
percentage decreases in (A) or (B) apply.

In determining whether we should adopt the unitary view
advocated by petitioner or the segregated view advocated by
respondent, we look first to the applicable statutory provi-
sions. Both parties claim that the language and structure of
the provisions support their view. Respondent contends that
the placement in section 818(c)(2)(A) of the parenthetical

---

[21]For the sake of convenience and pursuant to industry usage, we will refer to insurance other
than term insurance as "permanent" insurance. See *supra* note 18.

phrase "(other than term insurance)" after "insurance in force" and before the phrase "under such contracts," and the use of the conjunctive "and" between subparagraphs (A) and (B), indicate that the individual contracts should be split into components, i.e., the segregated view. Petitioner asserts that the use of the plural verb "cover" in subparagraph (B) indicates that it modifies "contracts" rather than "insurance," thus demonstrating a legislative intention that the requisite determination be made on the basis of whole contracts, i.e., the unitary view. Additionally, we note that the word "contracts" also appears in the portions of section 818(c) preceding subsections (c)(2)(A) and (B).

We think that the use of the word "cover" does not preclude segregation of components, but merely indicates that if there is a term policy which contains coverage in excess of 15 years, it will be eligible for some subparagraph (B) adjustment. Similarly, we think that the use of the word "contracts" goes only to the contracts, i.e., life insurance policies, with respect to which reserves are to be calculated, and does not preclude a breakdown of those calculations based upon the component elements of coverage set forth in those contracts. The most that can be said is that there may be some ambiguity in the statutory language. Under these circumstances, we may look to the legislative history in an effort to ascertain what Congress intended. See *Colony, Inc. v. Commissioner*, 357 U.S. 28, 33 (1958); see also *Bates v. United States*, 581 F.2d 575, 579–580 (6th Cir. 1978); *Huntsberry v. Commissioner*, 83 T.C. 742, 747–748 (1984).

The committee reports on the provision enacted as section 818(c) explain the revaluation technique as follows:

Under [the approximate] method, with respect to contracts for which reserves are computed under the preliminary term basis, the reserves are increased by *the sum of* (A) $21 per $1,000 of *insurance in force* (other than term insurance), less 2.1 percent of reserves therefor, and (B) $5 per $1,000 of term *insurance in force* under contracts which at the time of issuance cover a period of more than 15 years, less 0.5 percent of reserves therefor.

If the taxpayer elects one of the two methods provided in this subsection, *all contracts* for which life insurance reserves are computed on a preliminary term basis *must be so converted.* [H. Rept. 34, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 736, 766–767; S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 824. Emphasis added.]

We think that the phrase "the sum of" combined with the phrase "insurance in force" indicates that Congress was focusing on the amount of each type of coverage. This conclusion is reinforced by the fact that, in describing the coverage to which the $21 increase applies, the committee reports omit any reference to "contracts." The use of the word "contracts" in the final sentence of the committee report seems to us to say only that if an insurance company elects to come within section 818(c), its election must cover "all [eligible] contracts" whether term or permanent, and does not preclude segregation of the components of the covered contracts.[22]

We likewise find no clear-cut indication of congressional intent in the legislative history at the time section 818(c)(2) was amended in 1982, reducing the revaluation factor under subparagraph (A) to $19 per $1,000 of insurance in force and 1.9 percent of reserves.[23] See Pub. L. 97–248, sec. 267(a)(1), 96 Stat. 550–551 (1982). The Senate Finance Committee report accompanying that legislation stated—

> The committee has been informed that some policies which are in substance renewable term policies eligible only for, at most, the $5 per thousand approximate revaluation adjustment have been labeled "whole life" policies so that the issuing company may claim the higher revaluation adjustment for insurance other than term insurance. * * *While the committee recognizes that certain graded premium policies may be appropriately treated as whole life policies, the committee is concerned that many graded premium policies are not entitled to the reserve deductions claimed by the issuing companies. It is the committee's understanding that whole life policies eligible for the $19 per thousand reserve revaluation adjustment should either have a substantial cash surrender value within several years after the policy is issued or level premiums should be charged within a relatively short period of time after the policy is issued. The committee expects the Treasury Department to issue regulations dealing with this matter. [S. Rept. 97–494, at 341 (1982). Fn. ref. omitted.]

---

[22]We note that the legislative committees which dealt with the Life Insurance Company Income Tax Act of 1959 were made aware of the existence of combination and/or fluctuating coverage policies, but not in the context of matters covered by sec. 818(c). See Taxation of Income of Life Insurance Companies: Hearings Before a Subcomm. of the House Comm. on Ways and Means, 85th Cong., 2d Sess. 212–213 (1958).

[23]We note that, in any event, the use of such legislative history (some 23 years after sec. 818(c) was enacted) would at best be hazardous. See *Waterman Steamship Corp. v. United States*, 381 U.S. 252, 269 (1965); *Knowlton v. Commissioner*, 84 T.C. 160, 169 (1985).

While it can be argued that the references to "graded premium policies" indicate that the Senate Finance Committee was thinking in terms of contracts rather than component coverage, it can equally be asserted that the committee was simply saying that to be eligible at all for the reduced $19-per-thousand increase, certain conditions would have to be met, i.e., substantial cash surrender value or early level premiums, without implying that once eligibility was established, it should apply to the entire coverage provided by the policy. See Report to the Congress by the Comptroller General, "Billions of Dollars Are Involved in Taxation of the Life Insurance Industry—Some Corrections in the Law are Needed" 64–66 (1981), cited in S. Rept. 97–494, at 341 (1982).

Left with no firm guidance from the legislative history, we think it appropriate to consider the segregated-versus-unitary issue in light of the policy underlying the enactment of section 818(c). We conclude that the segregation of a given policy into its component elements of coverage is more in keeping with that policy. The committee reports on the Life Insurance Company Income Tax Act of 1959, the legislation containing section 818(c), explain that, for tax purposes, there is—

a hardship on insurance companies using preliminary term reserves. as compared with those which use ordinary [net level premium] reserves, since the policy and other contract liability deduction depends on the size of the reserves. Moreover, additions to the reserves, deductible under phase 2, also would in some cases be smaller. To avoid this result, life insurance companies which have computed their reserves on a preliminary term basis are permitted to recompute their reserves on a net level premium basis. This can be done either by an exact revaluation of the reserves to a net level premium basis *or by approximating this result under a formula set forth in the bill.* [H. Rept. 34, *supra*, 1959–2 C.B. at 748; S. Rept. 291, *supra*, 1959–2 C.B. at 792. Emphasis added.]

The rationale behind the formula chosen by Congress in section 818(c)(2) appears to be that, for equal amounts of insurance, net level premiums in the early years of a permanent insurance policy are necessarily higher than those for a term policy.[24] Because preliminary term reserve methods

---

[24]This is true due to the nature of term insurance, which insures only against the *contingency* of death within the stated term, as opposed to permanent insurance, which insures against the *certainty* of eventual death. See D. McGill, Life Insurance 44 (rev. ed. 1967). Because level gross premiums under a permanent insurance contract generally greatly exceed, in the early policy years, the actual cost of insuring against then-improbable deaths, permanent insurance builds

generally produce comparable reserves for term and permanent insurance, there is, on the average, a larger difference between net level premium reserves and preliminary term reserves in the early policy years for permanent insurance than for term insurance, resulting in the need for the greater revaluation factor in section 818(c)(2)(A) than in section 818(c)(2)(B).

It is clear, then, that the differential between exact revaluation, i.e., use of a net level premium basis, and valuation on a preliminary term basis to compute the reserve with respect to a pure permanent policy is greater than the comparable differential with respect to a pure term policy, and that the approximate formula contained in section 818(c)(2) was intended to compensate for these differentials. It is equally clear that to the extent that term coverage is accorded the benefit of the formula applicable to permanent insurance, the life insurance companies are obtaining reserve deductions in excess of those which would have been obtained had the term coverage been separately revalued. Indeed, the element of overcompensation was involved in the change in the formula for insurance "other than term insurance" under section 818(c)(2)(A), enacted by Congress in 1982. See *supra* p. 544.[25]

In arguing that the applicability of section 818(c)(2)(A) and (B) should be determined on a "contract", i.e., unitary, basis, petitioner points to what it considers to be significant differences between the policies involved herein and the situation which would have obtained had each of the coverage elements in those policies been provided either in separate contracts or in a permanent insurance policy with riders attached. In the latter cases, there would have been separate premiums,

---

substantial cash values. To hold reserves adequate to cover policy risks and these cash values, companies must add larger net premiums in the early policy years to its reserves with respect to permanent insurance contracts than to its reserves with respect to term insurance contracts. See *supra* notes 3 and 7.

[25]In pointing to the policy element of the legislative history of sec. 818(c), we do not accept respondent's position that there is an abuse of the provisions of sec. 818(c) for which petitioner should be penalized simply because it calculated higher reserves for the contracts in issue using the approximate revaluation method than it would have calculated using the exact revaluation method. See Staff of Joint Comm. on Taxation, 98th Cong., 2d Sess., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 597 (Comm. Print 1984) (explaining prior law); Rev. Rul. 77–312, 1977–2 C.B. 235. We note that respondent's expert actuarial witness, Dr. Kabele, testified at trial that the $21 per $1,000 revaluation formula under sec. 818(c)(2)(A) itself yields reserves of varying accuracy as compared with the exact method depending on the insured's age at issuance, resulting in "fairly accurate" deductions on contracts issued at age 35, insufficient deductions at age 45, and excessive deductions at age 55.

separate administrative costs, separate reserves, and separate rights of the policy holder, i.e., the ability to terminate one part of the coverage (other than the permanent coverage) and to keep the remaining parts in force.[26] With respect to the policies involved herein, there was a lower single gross premium for all the coverage than the aggregate of what the premiums would have been for separate coverage, the overall administrative costs were lower, there was a single reserve, and the insured could not separately terminate any part of the coverage (as he or she might wish to do with respect to coverage not needed in later years) without terminating the entire policy. But this separateness does not, in our opinion, require a single characterization of the contract for the purposes of section 818(c)(2).

None of the separate elements upon which petitioner relies compels the conclusion that the preliminary term reserves for those policies cannot be segregated into portions representing each element of coverage. Indeed, petitioner's own expert admitted that it was possible to segregate the reserves into component elements of coverage and agreed that the issue before the Court was whether the segregation approach *should be adopted*.[27] To be sure, he posited his agreement as to segregation on a purely theoretical basis, testifying that there are many permutations and combinations of segregation for any given policy. The fact that a variety of theoretical approaches may be possible does not mean that we cannot segregate the facially discernible term and permanent components of the coverage provided by the actual policies involved herein. Indeed our own concern for not permitting theory to dictate the results which should obtain in real situations causes us to reject the contention, which respondent appears to embrace, that we should go behind the coverage facially discernible in decreasing (or increasing) term policies so as to eliminate from the adjustments under subparagraph (B) that

---

[26]In this situation, if the foundation of the policy, i.e., the permanent coverage, were to be terminated, the entire policy would be terminated.

[27]Petitioner in fact made such a segregation, reporting portions of the contracts in issue as term insurance on its annual statements and tax returns for the years in issue. Petitioner, in the stipulation of facts by the parties, takes the position that such treatment was in error. While we do not consider such treatment by petitioner an admission, and respondent does not argue to the contrary, we note that petitioner's reporting for the years in issue, as well as the agreement by both parties at trial that segmenting the contracts is possible, if not desirable, casts serious doubt on the impossibility of segregating the contracts.

portion of the coverage which represents coverage having a term of 15 years or less.[28]

We conclude that respondent's position is essentially correct and that the components of the policies in issue herein representing term life insurance and those representing life insurance "other than term" should be segregated for the purpose of applying section 818(c)(2).[29] In definitional terms, this means determining the coverage facially discernible from each of the policies in issue which expires at a fixed point in time other than the insured's death, i.e., term insurance, and that payable on the death of the insured whenever that occurs, i.e., "other than term," or permanent, insurance. See *Lincoln National Life Insurance Co. v. United States*, 217 Ct. Cl. 515, 582 F.2d 579, 590 (1978); D. McGill, Life Insurance 44 (rev. ed. 1967); S. Huebner & K. Black, Life Insurance 67 (10th ed. 1982); D. Gregg & V. Lucas, Life and Health Insurance Handbook 55 (3d ed. 1973).

Our opinion thus far furnishes a clear direction to the parties for answering the first two of the four previously articulated elements; see *supra* p. 542, involved in the application of section 818(c)(2)(A) and (B). One additional task remains

---

[28]Thus, respondent's expert testified that a 20-year term insurance policy providing coverage in the amount of $1,000 decreasing at a rate of $50 per year should be viewed in layers—a 1-year term policy for $1,000 plus a 2-year term policy for $950 plus a 3-year term policy for $900, etc. Under this view, the only insurance covering a period of more than 15 years, i.e., qualifying under sec. 818(c)(2)(B), is in the amount of $250, and that amount decreases by $50 per year during years 16–20. While this may be a valid theoretical approach, we see a material distinction between (1) segregating facially discernible term coverage from facially discernible permanent coverage as such and (2) layering the amounts of coverage within what is on its face one term insurance policy. When the amount of coverage fluctuates depending on the policy year of death, such fluctuation is incompatible with the concept of permanent insurance, which by definition provides a death benefit payable regardless of the date of death. See D. McGill, Life Insurance 58 (rev. ed. 1967); S. Huebner & K. Black, Life Insurance 77 (10th ed. 1982). However, there is nothing sufficiently unusual or antithetical about increasing or decreasing term insurance policies to require a further segregation of such policies by amount into their theoretical component layers. See D. McGill, *supra* at 51–52; D. Gregg & V. Lucas, Life and Health Insurance Handbook 56–57 (3d ed. 1973). Similarly, while it may be theoretically valid to view pure permanent insurance, i.e., insurance featuring level gross premiums and a level death benefit, as term insurance for a term consisting of the mortality period of the insured with an increasing investment element, it is inconceivable that this kind of policy would not be eligible for the adjustments under subparagraph (A). Compare D. McGill, *supra* at 38, and D. Gregg & V. Lucas, *supra* at 69–70, with S. Huebner & K. Black, *supra* at 79.

[29]We note that our holding in *Moseley v. Commissioner*, 72 T.C. 183 (1979), urged by petitioner as dispositive on this issue, has no bearing on the instant case. In *Moseley*, we dealt with the taxability under sec. 72 of insurance proceeds, part of which were attributable to a special reserve built up with a portion of the gross premiums paid. Despite the fact that, due to investment gains by the fund, the proceeds exceeded the aggregate premiums credited to the special reserve, we held the proceeds to be a nontaxable recovery of premiums. Such holding has no relevance to the question whether contracts must be segmented into components under sec. 818(c)(2).

before we analyze the individual policy plans involved herein. Some further comment is required in order to calculate the amount of insurance to which the $21 or $5 per thousand applies (the third element) and the amount of reserves to which the percentages decreases in subparagraph (A) or (B) apply (the fourth element). As to the third element, we have rejected the layering process suggested by respondent's expert witness. See *supra* p. 548 & note 28. Accordingly, as to that element, the amount of each facially discernible component of coverage in force in each taxable year in issue under a particular policy should be taken into account in applying $21 or $5 per thousand, as the case may be. With respect to the fourth element, we hold that the calculation should be made by allocating the reserve for each policy based upon the reserves which would have been set aside if each component had been sold separately. We recognize that the parties have stipulated that petitioner did not in fact sell the components separately, but this should not be an insurmountable obstacle to the aforementioned allocation; as we understand it, the calculation of reserves is based not upon the gross premium charged, but rather upon the amount that should be set aside based upon mortality and interest rates specified by the appropriate insurance authorities. Thus, a calculation of the proper reserve for each component can be made. Neither does the fact that, as petitioner's expert testified, the sum of these component reserves may be more than petitioner's actual reserves constitute an obstacle to such allocation. The portion of petitioner's single reserve allocable to a particular component should be that proportion of petitioner's actual reserve which the reserve for that component, calculated as if it had been sold separately, bears to the sum of the reserves for all the components, calculated as if they had been sold separately.[30]

It now remains to be determined whether petitioner's contracts issued under policy plans P8, P9, O1, OO, and OL are, within the meaning of section 818(c)(2), "other than term insurance," "term insurance under such contracts which at the time of issuance cover a period of more than 15 years," or

---

[30]The denominator of this ratio should include the separate reserve so calculated in respect of coverage for a term of 15 years or less, which is not eligible for the adjustments provided in subpar. (B).

neither. Contracts under plans P8 and P9 provide for payment of the Face Amount at death, an Additional Death Benefit if death occurs prior to the end of the 15th policy year, and a Return of Premium Death Benefit if death occurs prior to the earlier of the end of the 20th policy year or age 65. Under the standards we have established, the Face Amount is covered by section 818(c)(2)(A). The Additional Death Benefit, which is payable only during a period of 15 years or less, does not qualify under section 818(c)(2)(A) or (B). Similarly, if, based upon the insured's age at date of issuance, the Return of Premium Death Benefit is not payable beyond 15 years from the date of the issuance of the policy, that benefit will not be covered by either section 818(c)(2)(A) or (B). Otherwise, the Return of Premium Death Benefit will be covered by section 818(c)(2)(B), but in the amount actually in force in any given taxable year. See discussion of the "third element," *supra* p. 549.

Contracts under plan O1 provide for payment of the Sum Insured at death and a Return of Premium Death Benefit if death occurs prior to the end of the 20th policy year. The Sum Insured is covered by section 818(c)(2)(A), and the Return of Premium Benefit is covered by section 818(c)(2)(B), but in the amount actually in force in any given taxable year.

Contracts under plan OL provide for payment of the Amount of Insurance at death in an amount varying with the insured's age at issue and the policy year in which death occurs, pursuant to a table incorporated in each contract. A designated amount (the Ultimate Amount) is payable no matter when death occurs. Under the standards we have established, the Ultimate Amount is "other than term insurance," i.e., permanent insurance, and is covered by section 818(c)(2)(A). The remaining amount is "term insurance." Whether it is covered by section 818(c)(2)(B) depends upon whether, based upon the insured's age at the date the policy was issued, the period measured from the date of issuance to the date after which only the Ultimate Amount is payable is more than 15 years. If it is not, none of the term insurance under that policy is covered by that section. If it is, it will be covered by section 818(c)(2)(B), but in the amount actually in force in any given taxable year.

Contracts under plan OO provide for payment of the Basic Amount of Insurance at death and an Insured Annual Income Death Benefit if death occurs before age 65, both of which benefits vary in amount with the insured's age at issue and the policy year in which death occurs, pursuant to a table incorporated in each contact. Under the standards we have established, the part of the Basic Amount of Insurance which is in any event payable upon the insured's death after age 65 is covered by section 818(c)(2)(A). The balance of the Basic Amount and the full amount of the Insured Annual Income Death Benefit constitute "term insurance." Whether these amounts are covered by section 818(c)(2)(B) will depend upon whether the insured had attained age 50 as of the date the policy was issued. If he or she had, no part of said amounts under that policy will be covered by section 818(c)(2)(B), because the term at issuance involved will not be more than 15 years. If the insured was less than 50 years of age at the date of issuance, these amounts will be covered by section 818(c)(2)(B), but in the amount actually in force in any given taxable year.[31]

## Issue 3

### FINDINGS OF FACT

During each of the years 1971, 1972, 1973, and 1974, petitioner had in force certain individual accident and health insurance policies that are at issue in the instant case (the "renewable individual accident and health insurance policies"). Under the terms of certain of petitioner's renewable individual accident and health insurance policies, petitioner either (a) could neither cancel coverage nor refuse to renew coverage at the annual gross premium specified in the policy during the insured's life, or (b) could neither cancel coverage

---

[31]We recognize that, though we essentially hold for respondent on the issue of segregating combination policies into their component parts, our approach to the application of sec. 818(c)(2) to combination policies differs from the positions of both parties. Indeed, neither petitioner in its returns for the years in issue nor respondent in his statutory notice attempted to allocate petitioner's reserves among the various components of the policies' coverage or to calculate the 0.5 percent reserve reductions. However, neither party now maintains that its treatment of the reserves was correct, and the language of sec. 818(c)(2) clearly requires the reserve reductions. Our opinion, based solely on the facts stipulated to by the parties and presented at trial, merely develops the legal principles underlying sec. 818(c)(2) and establishes guidelines for the computation of the proper reserve adjustments in determining the decision to be entered under Rule 155.

nor refuse to renew coverage at the annual gross premium specified in the policy until the insured attained age 65. Under the terms of the remainder of petitioner's renewable individual accident and health insurance policies, petitioner could neither cancel coverage nor refuse to renew coverage at the annual gross premium specified in the policy until the earlier of the insured's (1) attaining age 65 or (2) becoming eligible for "Medicare." The annual gross premium payable with respect to each of petitioner's renewable individual accident and health insurance policies was level for the duration of the policy. Such annual gross premium specified in such policies was based on the insured's age at issuance. Petitioner could not change the annual gross premium specified in any of its renewable individual accident and health insurance policies as a result of changes in the insured's health or occupation, claims made by the insured under his or her policy, or increases in the insured's attained age. Under the terms of its renewable individual accident and health insurance policies, petitioner could, however, adjust annual gross premium rates by classes in accordance with its experience under such policies.

The annual gross premium petitioner charged for its renewable individual accident and health insurance policies was higher than the annual gross premium it would have charged for comparable policies provided on a cancellable basis, e.g., on a basis where petitioner could have adjusted premiums based on the insured's increasing age, changes in the insured's health or occupation, or claims made by the insured under his or her policy. Such higher annual gross premium that petitioner charged for its renewable individual accident and health insurance policies was intended to cover the additional cost inherent in petitioner's long-term obligation to renew the coverage in later years when the insured was older.

There are no differences in the terms and provisions of petitioner's renewable individual accident and health insurance policies, or in its contractual obligations thereunder, based upon how long such policies have been in force. Specifically, petitioner is contractually bound to precisely the same extent under a renewable individual accident and health insurance policy that has been in force for 2 years or less as it

is under a renewable individual accident and health insurance policy that has been in force for more than 2 years.

The insurance industry recognizes the type of insurance product called the guaranteed renewable individual accident and health insurance policy (GRAH policy). A GRAH policy generally has the following characteristics: level annual gross premiums are payable, are based on the insured's age at issuance, and do not increase as the insured grows older; the issuing company can neither cancel coverage nor refuse to renew coverage at the annual gross premium specified in the policy until a specified age, notwithstanding changes in the insured's health or occupation or claims made by the insured under the policy; and the issuing company can adjust the annual gross premium rates by classes in accordance with its experience under policies of that type. A GRAH policy thus provides the insured with the benefit of an annual gross premium rate unaffected by changes in the insured's age or health, and also enables the insurer, through its ability to change annual gross premium rates by classes, to cope with inflation and changes in health care standards affecting claim costs. Because of the long-term obligations of an issuer to renew GRAH policies and the limited circumstances in which an insurer may increase annual gross premiums under GRAH policies, insurers issuing such policies assume long-term morbidity risks that extend beyond the period for which a gross premium has been paid (the "current term" of the policy).

Each of petitioner's renewable individual accident and health insurance policies in issue here had from the date each such policy was issued the characteristics of a GRAH policy, and is considered within the insurance industry to be a GRAH policy.

With respect to the aggregate of its renewable individual accident and health insurance policies, petitioner established and held as of the end of each of the years 1971, 1972, 1973, and 1974 an active life reserve consisting of two reserve components: (1) a gross pro rata unearned premium reserve, and (2) an additional statutory life insurance reserve computed on the mid-terminal reserve basis (a mid-terminal reserve). An unearned premium reserve with respect to an insurance policy is a reserve established as of December 31 (the valuation date) to cover claims and benefits that will be incurred during

the remainder of the current term of the policy. No part of an unearned premium reserve remains at the termination of the premium payment period. A gross pro rata unearned premium reserve as of the valuation date is equal to that portion of the gross premium paid for the current term of an insurance policy which bears the same proportion to the total gross premium paid for the current term of such policy as the number of months in the unexpired current term of such policy bears to the total number of months in the current term of such policy. In computing its gross pro rata unearned premium reserve with respect to its renewable individual accident and health insurance policies as of the end of each of the years 1971, 1972, 1973, and 1974, petitioner assumed that gross premiums with respect to such policies were received at a uniform rate throughout each month or, in effect, that each gross premium was received on the 15th day of the respective month. Thus, as of December 31 of any given year, all renewable individual accident and health insurance policies issued in December were considered to have been in force for one-half month, policies issued in November were considered to have been in force for 1½ months, etc. For example, as of December 31 of any given year, the gross pro rata unearned premium reserve with respect to a renewable individual accident and health insurance policy issued in November with a current term of 1 year and an annual gross premium of $100 would be $87.50 ($87.50/$100.00 = 10.5/12).

The second component of the active life reserve established and held at the end of each of the years in issue by petitioner with respect to its renewable individual accident and health insurance policies was the additional reserve that petitioner computed with respect to such policies on the mid-terminal reserve basis. This additional or mid-terminal reserve arose from petitioner's long-term obligation to renew its policies. The purpose of the additional reserve is to cover claims and benefits that will be incurred after the end of the current term of the renewable individual accident and health insurance policies. A life insurance company typically holds an additional or mid-terminal reserve only with respect to those policies that place on the insurer a risk extending beyond the current term of the policy and for which at some point future gross premiums alone will be inadequate to pay expected claims.

The term "mid-terminal" reflects the use at the valuation date of an average figure based on the assumption that policies are sold at uniform intervals, so that all policies issued in any given calendar year may be deemed to have a mean, average, or "mid-terminal" date of July 1.

All of petitioner's renewable individual accident and health insurance policies in force at the end of each of the years in issue, regardless of whether such policies were at that time in force for 2 years or less or for more than 2 years, exposed petitioner to long-term morbidity risks arising from its long-term obligation to renew such policies, which extended beyond the current term of the policies. Because of such long-term morbidity risks, petitioner established and held at the end of each of the years 1971, 1972, 1973, and 1974 an additional or mid-terminal reserve with respect to such policies that was required to be adequate to cover its obligations on all such policies including policies in force for 2 years or less and for more than 2 years. Petitioner established and held the mid-terminal reserve with respect to its renewable individual accident and health insurance policies to cover its future contingent claims—those not yet incurred—under such policies. Such mid-terminal reserve was equal to the excess of the present value of future benefits payable under such policies over the present value of future net premiums under such policies. The mid-terminal reserve petitioner established and held at the end of each of the years 1971, 1972, 1973, and 1974 with respect to its renewable individual accident and health insurance policies was computed on the basis of (1) recognized morbidity and mortality tables within the meaning of section 801(b)(1)(A), including the 1964 Commissioners Disability Table, the 1956 Intercompany Hospital and Surgical Tables, and the 1958 Commissioners Standard Ordinary Mortality Table, (2) an assumed rate of interest of 3 percent, and (3) the 2-year preliminary term method.

The 2-year preliminary term method of computing reserves with respect to GRAH policies is a recognized actuarial method that has been accepted by the NAIC and by the pertinent regulatory agencies of all those States in which petitioner does business, including the Tennessee Department of Insurance. The 2-year preliminary term method is the method most commonly used for computing reserves on GRAH policies. Both

the Report of NAIC Task Force 4 on Valuation Standards, dated November 26, 1956, and the 1964 Report of the NAIC Industry Advisory Committee on Health Insurance Reserves recommended, inter alia, the adoption of the 2-year preliminary term method for valuing reserves held with respect to GRAH policies. The recommendations of the 1964 Report of the NAIC Industry Advisory Committee on Health Insurance Reserves were adopted by the NAIC at its December 1964 meeting and are generally recognized and accepted by all States as a suitable minimum valuation standard for GRAH policies. The 2-year preliminary term method is a recognized preliminary term method within the meaning of section 1.818–4(a), Income Tax Regs.

Mechanically, the computation on the 2-year preliminary term basis of the additional or mid-terminal reserve with respect to petitioner's renewable individual accident and health insurance contracts was, during the years here in issue, as follows: An amount was computed for its renewable individual accident and health insurance policies in force for more than 2 years as of the end of each year in issue by applying to benefits under each such policy unit reserve factors computed on the basis of the mortality and interest assumptions discussed above. The amount so computed was added to petitioner's mid-terminal reserve with respect to its renewable individual accident and health insurance contracts. When a mid-terminal reserve is calculated on the basis of the 2-year preliminary term method, such reserve with respect to a GRAH policy in force for 2 years or less would be equal to zero dollars. Therefore, the use of the 2-year preliminary term method permitted petitioner to arrive at a reserve of zero dollars with respect to its renewable individual accident and health insurance policies in force for 2 years or less as of the end of each year in issue; with respect to such policies, then, petitioner added zero to its mid-terminal reserve.

While the additional or mid-terminal reserve is mechanically developed by applying unit reserve factors to unit benefits of single policies, separate reserves are not held on single policies. Rather, the additional or mid-terminal reserve is an aggregate reserve, and has actuarial meaning only with respect to an entire group of policies. Mortality and morbidity tables are used in the calculation of unit reserve values, and

such tables assume that a large population of policyholders is expected to die or become ill according to certain yearly rates. The additional or mid-terminal reserve is an aggregate amount which, together with future net premiums, will meet the benefit payments arising from the group of policies valued as such benefits accrue in the future. The application of a formula for the calculation of such reserve to an individual policy (or small group of policies) does not produce a meaningful result, since few policyholders will experience average morbidity.

The annual statement filed by petitioner with the Tennessee Department of Insurance for each of the years 1971, 1972, 1973, and 1974 included an exhibit labeled "Exhibit 9 - Aggregate Reserve for Accident & Health Policies." Exhibit 9 of the annual statement was subdivided into section A (exhibit 9A), the Active Life Reserve section, and section B, the Claim Reserve section. The first line of exhibit 9A was labeled "Unearned premium reserve." The second line of exhibit 9A was labeled "Additional reserves." The entry on line 1 of exhibit 9A of petitioner's annual statements for each of the years 1971, 1972, 1973, and 1974 included the gross pro rata unearned premium reserve that petitioner established and held with respect to its renewable individual accident and health insurance policies. The entry on line 2 of exhibit 9A of petitioner's annual statements for each of the years 1971, 1972, 1973, and 1974 included the additional or mid-terminal reserve that petitioner established and held with respect to its renewable individual accident and health insurance policies.

For each of the years 1971, 1972, 1973, and 1974, the reserve with respect to petitioner's renewable individual accident and health insurance policies that petitioner valued and reported in its annual statements was accepted by the Tennessee Department of Insurance as held for the fulfillment of the claims of policyholders or beneficiaries of such policies. Once petitioner's reserve with respect to its renewable individual accident and health insurance policies was, as described above, established and reported in its annual statements to the Tennessee Department of Insurance, petitioner was required by Tennessee statutory provisions and by the rules and regulations of the Tennessee Department of Insurance to maintain such reserve on such basis and not to reduce or

"weaken" such reserve by changing such basis without the approval of the department. Since, as is the case with the general account assets of any insurance company, there is no specific identification or segregation by petitioner of certain of its assets to support certain of its reserves, any asset of petitioner is available to pay claims of policyholders or beneficiaries of insurance or annuity contracts issued by petitioner.

On its tax return for each of the years 1971, 1972, 1973, 1974, petitioner did not revalue under section 818(c) the additional or mid-terminal reserve computed on a recognized preliminary term basis that it held with respect to its renewable individual accident and health insurance policies. Respondent determined that petitioner's renewable individual accident and health insurance policies in force for more than 2 years as of the end of each of the years 1972, 1973, and 1974 were "guaranteed" renewable accident and health insurance policies within the meaning of section 1.801–3(d), Income Tax Regs., and he therefore revalued under section 818(c) for each such year the additional or mid-terminal reserve computed on a recognized preliminary term basis with respect to such policies. However, respondent determined that petitioner's renewable individual accident and health insurance policies in force for 2 years or less as of the end of each of the years 1971, 1972, 1973, and 1974 were not "guaranteed" renewable accident and health insurance policies within the meaning of section 1.801–3(d), *supra*, and he therefore did not revalue under section 818(c) the additional or mid-terminal reserve computed on a recognized preliminary term basis with respect to such policies.

OPINION

The issue for our decision is whether petitioner's renewable individual accident and health insurance policies that were in force for 2 years or less at the end of its taxable years 1971, 1972, 1973, and 1974 are "guaranteed renewable" accident and health insurance policies within the meaning of section 1.801–3(d), Income Tax Regs. If they are, the reserves with respect to the contracts issued under such policies are eligible for revaluation under section 818(c).

Section 1.801–3(d), Income Tax Regs., provides, in relevant part—

The term "guaranteed renewable life, health, and accident insurance policy" means a health and accident contract, or a health and accident contract combined with a life insurance or annuity contract, which is not cancellable by the company but under which the company reserves the right to adjust premium rates by classes in accordance with its experience under the type of policy involved, *and with respect to which a reserve in addition to the unearned premiums (as defined in paragraph (e) of this section) must be carried to cover that obligation.* * * * [Emphasis added.]

For its renewable individual accident and health insurance policies, petitioner held an active life reserve consisting of (1) a gross pro rata unearned premium reserve, to cover claims and benefits that will be incurred during the remainder of the period for which a gross premium has been paid, and (2) an additional, mid-terminal reserve, to cover petitioner's long-term obligation to renew the policies. Petitioner calculated its mid-terminal reserve with respect to the policies in issue on the basis of the 2-year preliminary method.

Respondent contends that the policies in issue that were in force for 2 years or less at the time of the reserve computations for the years in issue do not qualify under section 1.801–3(d), *supra*, as the 2-year preliminary term method necessarily results in a mid-terminal reserve with respect to a policy in force for 2 years or less of zero dollars. Thus, according to respondent, no "reserve in addition to the unearned premiums * * * must be carried" for the policies in force 2 years or less, and section 1.801–3(d), *supra*, is not satisfied.

This Court, in two recent Court-reviewed opinions, decided precisely this issue in favor of the taxpayers. *National States Insurance Co. v. Commissioner*, 81 T.C. 325 (1983); *United Fire Insurance Co. v. Commissioner*, 81 T.C. 368 (1983). As the parties have stipulated that the material facts of such cases are identical to those in the instant case, and that following such decisions will result in a decision for petitioner on this issue, and as we decline to review again our carefully considered decisions in *National States* and *United Fire*, we hold that the policies in issue are guaranteed renewable accident and health insurance policies within the meaning of section 1.801–3(d), *supra*.

In light of the parties' concessions and stipulations, and the foregoing opinion,

*Decision will be entered under Rule 155.*